[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 14 
¶ 1. Jeffrey Hubbard a/k/a Jeffrey Salley was found guilty in the Circuit Court of Calhoun County, Mississippi of armed robbery. He was sentenced to serve a term of thirty-four years in the custody of the Mississippi Department of Corrections. Aggrieved by his conviction, Hubbard raises the following four issues on appeal.
 ISSUES PRESENTED
I. Did the trial court err by failing to suppress both the pretrial identification of Hubbard and the in-court identification?
II. Did the trial court err by denying Hubbard's motion for funds to obtain an expert in the field of psychiatry?
III. Did the trial court commit reversible error by not allowing Hubbard to address the jury?
IV. Did plain error occur when the State told the jury during opening and closing arguments that if convicted, Hubbard would be eligible for parole?
 STATEMENT OF FACTS ¶ 2. On June 15, 2001, at approximately 9:00 p.m., a man knocked on the back door of Wayne and Nona Faye Clark's rural home in Calhoun County. The person at the door said that he had come to pay on the Steen account. The Clark's owned a furniture store across the street from their home and customers frequently stopped by to pay on their account. Wayne Clark opened the door to let the man inside the home. Upon opening the door, three men entered the Clark's home. The first man through the door demanded money from Mr. Clark. Mr. Clark reached for his pistol which was located in his pocket, but the gun snagged on his clothing and was taken away from him by the intruder.
 ¶ 3. The second man who entered the house grabbed Mrs. Clark, tied her up and placed her face-down behind the couch in the living room. He threatened to shoot her if she did not "shut up." After being in the Clark's home for about ten minutes, the three men left taking with them Mr. Clark's wallet and three rings.
 ¶ 4. After the intruders left, the Clarks went across the street and called the police from a neighbor's house. At that time they gave the police descriptions of the perpetrators. A live line-up was held several weeks after the robbery. Mr. and Mrs. Clark attended the line-up but did not make any identifications. The appellant, Hubbard, was not included in the line-up. In October, Mrs. Clark saw the photos of three men accused of robbing a bank in the local newspaper. She immediately identified the men as being the ones who robbed them in June 2001. One of the men that Mrs. Clark identified was Hubbard. Mrs. Clark showed the newspaper to Mr. Clark who identified all three men as the ones who robbed his home in June.
 ¶ 5. The Clarks notified the police that they saw the photos of the men who robbed them. The police went to the Clark's home and separately showed them photos of twelve men. From the photo array, Wayne Clark identified Arnold Johnson, Lester Bledsoe and Jeffrey Hubbard. Nona Faye Clark identified Hubbard and Johnson but not Bledsoe. The three men were jointly indicted for armed robbery in violation of Mississippi Code Annotated Section 97-3-79 (Rev. 2000). Bledsoe and Johnson were also indicted as habitual offenders. The trial court granted Hubbard's motion to sever and the trial proceeded with Hubbard only. The jury *Page 16 
found Hubbard guilty of armed robbery but were unable to fix a penalty. The trial judge sentenced Hubbard to serve thirty-four years in the custody of the MDOC. Hubbard's post-trial motions for JNOV or, in the alternative, a new trial were denied. Hubbard timely perfected his appeal to this Court.
 LEGAL ANALYSIS
I. DID THE TRIAL COURT ERR BY FAILING TO SUPPRESS BOTH THE PRETRIAL IDENTIFICATION OF HUBBARD AND THE IN-COURT IDENTIFICATION?
 ¶ 6. Hubbard asserts that the trial court erred by denying his motion to suppress identification evidence. The trial court allowed Mr. and Mrs. Clark to testify about the pretrial identification procedures. Mrs. Clark was permitted to make an in-court identification of Hubbard. The trial court further allowed Deputy Stan Evans to testify as to the identification procedures relating to Hubbard and that Mr. and Mrs. Clark were certain that Hubbard was one of the men that robbed them.
 ¶ 7. On appeal, Hubbard argues that both the pretrial and in-court identifications by Mr. and Mrs. Clark should have been suppressed because they were made under circumstances likely to result in misidentification. Hubbard claims that the admission of the identification evidence violated his due process rights and thereby deprived him of a fair trial. Hubbard's argument on appeal does not challenge the procedures used by the police in the photo array shown to the Clarks. Hubbard bases his argument on the fact that the Clarks could not identify him as being one of the men who robbed them until after they saw his mug shot in the local newspaper approximately four months after the robbery occurred.
 ¶ 8. The decision of the trial court to admit identification evidence will not be reversed on appeal unless we find clear error. Herrington v. State, 831 So.2d 580, 582 (¶ 8) (Miss.Ct.App. 2002). When an appellate court reviews the trial court's findings as to a pretrial identification which the defendant seeks to suppress, we must consider "whether or not substantial evidence supports the trial court's findings that, considering the totality of the circumstances, in-court identification testimony was not impermissibly tainted," and we will reverse those findings by the trial court "only where there is an absence of substantial credible evidence supporting it."Cousar v. State, 855 So.2d 993, 999 (¶ 17) (Miss. 2003) (citingMcDowell v. State, 807 So.2d 413, 419 (¶ 12) (Miss. 2001)).
 ¶ 9. Identification procedures must comply with the requirements of due process. Neil v. Biggers, 409 U.S. 188,196, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The factors to be considered when determining whether an identification complies with due process are as follows:
 (1) the opportunity of the witness to view the criminal at the time of the crime;
(2) the witness' degree of attention;
 (3) the accuracy of the witness' prior description of the criminal;
 (4) the level of certainty demonstrated by the witness at the confrontation; and
 (5) the length of time between the crime and the confrontation.
Id. at 199-200, 93 S.Ct. 375; Ferguson v. State,856 So.2d 334, 338 (¶ 10) (Miss.Ct.App. 2003). These factors are to be considered under the totality of the circumstance. Biggers,409 U.S. at 199, 93 S.Ct. 375. A review of the record establishes *Page 17 
the following analysis concerning the Biggers factors.
(1) THE OPPORTUNITY OF THE WITNESS TO VIEW THE CRIMINAL AT THE TIME OF THE CRIME.
 ¶ 10. Hubbard asserts that this factor is not satisfied because the Clarks were not in the robbers' presence long enough and Mrs. Clark, who made the in-court identification, was behind the couch tied up during the majority of the confrontation. Identifications have been admitted when the witness viewed the criminal for only a few seconds. Horne v. State, 825 So.2d 627, 638 (¶ 41) (Miss. 2002). Mr. Clark testified that the robbers were in his home for about ten minutes. Mrs. Clark stated that the robbers were there for maybe fifteen to twenty minutes. Mr. Clark saw the men as they entered his home through the back door. Mr. Clark testified that he spoke to the men as they entered and as they were robbing him. The Clarks had sufficient opportunity to the view the defendant at the time of the crime.
(2) THE WITNESS' DEGREE OF ATTENTION.
 ¶ 11. Hubbard asserts that this factor is not satisfied because Mrs. Clark was "hysterical" and was face-down behind the couch during the robbery. However, Hubbard seems to omit the testimony of Mr. Clark. Mr. Clark stated that when the man knocked on his door, he went over to the door and was able to see the money in the man's hands. Mr. Clark spoke with the men as they were robbing him. One of the perpetrators told Mr. Clark that he would cut his fingers off if he could not get the rings. Mr. Clark testified that one of the men was very close to him as he was taking his wallet and rings. Mr. Clark stated that he could see the man very well since he was looking him in the face. The Clarks were victims of a robbery and were threatened with weapons; however, their testimony shows that they were paying sufficient attention to satisfy this factor.
(3) THE ACCURACY OF THE WITNESS' PRIOR DESCRIPTION OF THE CRIMINAL.
 ¶ 12. Hubbard argues that this factor is not satisfied because the descriptions the Clarks gave to the police were general and somewhat inaccurate. The descriptions were as follows:
 (a) Black male, big man, 240-50 pounds, 5'9" to 5'10".
(b) Smaller black male, around 5'8", 150-160 pounds.
(c) Black male, 160-170 pounds, kind of slim build.
 ¶ 13. According to the Clarks, Hubbard was the second man in the door but was described first. Deputy Evans testified that at the time Hubbard was arrested he was 6'2" and weighed 230 pounds. The difference between the descriptions made by the Clarks and Hubbard's actual build is approximately ten pounds and a few inches in height. There is no absolute requirement on the degree of detail necessary for a description to be adequate.Herrington, 831 So.2d at 583 (¶ 15). While the description was general, it was reasonably adequate and satisfies this factor.
(4) THE LEVEL OF CERTAINTY DEMONSTRATED BY THE WITNESS AT THE CONFRONTATION.
 ¶ 14. The Clarks testified that they recognized Hubbard as being one of the men who robbed them after seeing his photo in the newspaper. Both testified that they were sure of their identification and then notified the police. Deputy Evans testified that when the Clarks were *Page 18 
shown the photo array, they both were certain that the men they identified committed the robbery. The Clarks never wavered on their identifications. The certainty was again shown when Mrs. Clark identified Hubbard during his trial.
(5) THE LENGTH OF TIME BETWEEN THE CRIME AND THE CONFRONTATION.
 ¶ 15. Hubbard argues that the identifications occurred too long after the robbery for them to be reliable. The robbery occurred on June 15, 2001, and the identification on October 25. In theBiggers case, the victim made an identification seven months after the crime occurred. Biggers, 409 U.S. at 201,93 S.Ct. 375. In that case the Supreme Court stated, "This would be a seriously negative factor in most cases. Here, however, the testimony is undisputed that the victim made no previous identification at any of the show-ups, line-ups or photo showings." Id. Similarly to Biggers, the Clarks were present at a line-up a few weeks after the robbery. They made no positive identifications at that time. Hubbard, Johnson and Bledsoe were not participants in the line-up. Deputy Evans brought two men to the Clarks home for identification, but the Clarks again stated that those were not the men that robbed them. It was only when they saw the mug shots in the newspaper that positive identifications were made.
 ¶ 16. Each of the Biggers factors is supported by substantial evidence. Under the totality of the circumstances, we find that there was sufficient evidence to support the trial court's admission of the identification evidence.
II. DID THE TRIAL COURT ERR BY DENYING HUBBARD'S MOTION FOR FUNDS TO OBTAIN AN EXPERT IN THE FIELD OF PSYCHIATRY?
 ¶ 17. Hubbard contends that the trial court erred by denying his pretrial motion for State funds to obtain his own personal expert in the field of psychiatry. Hubbard asked the trial court for funds because he claimed his own financial resources and those of his family and friends were depleted to the point that he was indigent. Also, Hubbard asserted that his "psychiatric make-up" would be a "significant factor" at trial. Interestingly, the State points out that Hubbard never gave notice of an insanity defense prior to trial.
 ¶ 18. The standard of review of the trial court's denial of expert assistance is abuse of discretion such that "the defendant was denied due process whereby the trial was fundamentally unfair." Chapin v. State, 812 So.2d 246, 248 (¶ 4) (Miss.Ct.App. 2002) (citing Richardson v. State, 767 So.2d 195, 197 (¶ 7) (Miss. 2000)). Whether the State is required to pay for a defendant to have an expert witness is determined on a case by case basis. Townsend v. State, 847 So.2d 825, 829 (¶ 13) (Miss. 2003). In Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087,84 L.Ed.2d 53 (1985), the Supreme Court enumerated three factors to be utilized in determining whether a defendant is entitled to the assistance of an expert witness to assist in the defense of his case. Id. at 69, 105 S.Ct. 1087. Those factors are: "(i) the private interest that will be affected by the action of the State, (ii) the government interest that will be affected if the safeguard is to be provided, and (iii) the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided." Id.
 ¶ 19. We have repeatedly held an evaluation of the defendant by a psychiatrist at Whitfield State Hospital satisfies the requirements of Ake v. Oklahoma. Chapin, 812 So.2d at 248-49 (¶ 4); Feazell v. State, *Page 19 750 So.2d 1286, 1288 (¶ 10) (Miss.Ct.App. 2000). At some point before trial, the trial court issued an agreed order sending Hubbard to the Mississippi State Hospital for a mental evaluation. According to the physician's report which was included in the record, Hubbard was evaluated as being criminally responsible at the time the alleged acts occurred and was competent to stand trial. This issue is without merit.
III. DID THE TRIAL COURT COMMIT REVERSIBLE ERROR BY NOT ALLOWING HUBBARD TO ADDRESS THE JURY?
 ¶ 20. Hubbard contends that the trial court committed reversible error by not allowing him to address the jury. Hubbard bases his argument on Article 3, Section 26 of the Mississippi Constitution which states that the accused shall have a right to be heard by himself or counsel, or both in criminal prosecutions. After the State rested, Hubbard's attorney asked to speak to the trial judge in chambers. The following exchange occurred in chambers:
 Mr. Neely (Hubbard's trial counsel): Mr. Salley [Hubbard] has advised me of something that I don't know what mechanism there is for he wants to speak to the jury on his own behalf.
 Trial Judge: Well, he certainly can't do that right now. I assume you told him that.
Mr. Neely: I told him he can testify.
Hubbard: I was unaware that the trial was over with.
Mr. Neely: It's not over. You can testify.
 Hubbard: I don't want to testify. I want to speak on my own behalf to the jury.
 Judge: Well, you understand the State has rested in this matter. Now whatever you and your attorney have decided you're going to present or not present, if anything, it's your opportunity to do so now. A very common tactic is that the defendant does not call any witnesses, but that's a decision between you and your attorney as to whether or not you're going to call any witnesses, and you've already been asked questions prior to the trial starting by your attorney on the record with regard to your right to testify as well as you right to remain silent.
 You remember being asked about that by your attorney, do you not?
 Hubbard: He told me. I asked him if I could speak on my own behalf and he told me I could.
 Judge: Okay. Well, speaking on your own behalf can occur in a number of ways; and testifying would be one of them. Of course, you would be subject to cross-examination by the State if you testify; and I'm sure your attorney has explained that to you.
 Hubbard: I didn't want to testify. I wanted to speak on my own behalf to the jury.
 Judge: That usually results in a form of testifying. All right. If you're going to speak on your own behalf, if you're going to talk about what you did or didn't do or why you think you're guilty or not guilty, why the jury should find you guilty or not guilty, you're in essence going to be testifying; and you're going to be subject to cross-examination if you want to testify. That's a fundamental rule of Court. You have the right to remain silent. . . .
 Hubbard: I'll take the stand if I have to take the stand to speak to the jury on my own behalf without being cross-examined.
 Judge: What I can't let you do is you cannot testify. You can't address the jury and tell the jury what happened or didn't happen without being subject to *Page 20 
cross-examination; but that, in essence is testifying.
 Hubbard: What if somebody like Stan Evans got on the stand and lied like I weighed 230 pounds when I was saying 205? Those are some of the things.
 Judge: Is this an example of why you want to address the jury?
Hubbard: Yes.
 Judge: That's testifying. That makes you subject to cross-examination by the State. All right. You want to say something different happened than what's alleged.
Hubbard: Yes.
 ¶ 21. After a break for lunch, Hubbard informed the court that he did not wish to testify and the defense rested.
 ¶ 22. Hubbard relies on the cases of Jones v. State,381 So.2d 983 (Miss. 1980) and Armstead v. State, 716 So.2d 576
(Miss. 1998) to support his argument that the trial judge should have allowed him to address the jury. In Jones, the defendant was allowed to make the closing argument during the sentencing phase of his trial. Jones, 381 So.2d at 997. On appeal, the supreme court recognized that a criminal defendant has the right to testify and the right to remain silent. Id. at 993. The court explained that the two rights create a conflict, requiring the defendant to make a choice. Id.
 ¶ 23. The court went on the say that an accused has the right to waive the Fifth Amendment privilege against self-incrimination and does so when he takes the stand and argues the merits of the case or goes beyond the record when arguing his case. Id. The court explained that the Fifth Amendment privilege is a shield not a sword. Id. The court stated:
 The practical solution to the dilemma presented by the accused who uses his constitutional right to argue his case to the jury to give, what is for all practical purposes, testimony is to treat the unsworn testimonial statements of the accused which were not supported by the record as a partial waiver of the privilege against self-incrimination. It is not a total waiver of the privilege, since the prosecution is unable to cross-examine the accused at this late stage of the trial. But the prosecution may comment to the jury that the defendant's statements were not given under oath and that he was not subject to cross-examination about them. The constitutional privilege of the criminal defendant appearing pro se is adequately protected if the court gives him a clear and direct warning out of the presence of the jury prior to beginning his argument that such limited comment might follow if he goes outside the record and gives what amounts to unsworn testimony.
Jones, 381 So.2d at 993.
 ¶ 24. Hubbard also relies on Armstead where the defendant wished to make his own closing argument. Armstead,716 So.2d at 579 (¶ 15). Even though Armstead and his attorney were in agreement that he should conduct the closing argument, the trial court denied the request on the grounds that Armstead would prejudice his defense by conducting the closing argument. Id.
The trial judge remarked, "I'm doing this for your own good. I'm not going to let you make that kind of mistake." Id. at 580 (¶ 15). Our supreme court reversed Armstead's conviction and ordered a new trial based on the statements by the trial judge. Id.
at 582 (¶ 26).
 ¶ 25. Hubbard's claim is distinguishable from Armstead. Here, the trial judge did not keep Hubbard from speaking to the jury. As the record clearly shows, the trial judge extensively questioned Hubbard on his understanding of his rights to testify and to remain silent. Hubbard's *Page 21 
attorney was strongly opposed to Hubbard speaking to the jury and so stated on the record. After taking a lunch break and conferring with his attorney, Hubbard decided not to speak to the jury. The decision was his to make and he made an informed choice not to speak on his own behalf.
 ¶ 26. Also distinguishable from Jones and Armstead, Hubbard did not wish to make an opening statement or closing argument. He essentially wanted to take the stand and speak to the jury for the purpose of contradicting the State's witnesses while not being subject to cross-examination. In Armstead, the court stated, "The defendant who argues pro se, of course, is not exempt from following the rules of court procedure, and must confine his remarks to the evidence in the record." Armstead,716 So.2d at 580 (¶ 17).
 ¶ 27. The trial judge did nothing to hinder Hubbard from speaking but simply made him aware of the consequences, such as being subject to cross-examination by the State, of delving into matters not in the trial record. Hubbard's argument on appeal is that he was not permitted to speak to the jury. This was not the case. Hubbard was allowed time to consider the consequences of his speaking to the jury and chose not to do so. This issue is without merit.
IV. DID PLAIN ERROR OCCUR WHEN THE STATE TOLD THE JURY DURING OPENING AND CLOSING ARGUMENTS THAT IF CONVICTED, HUBBARD WOULD BE ELIGIBLE FOR PAROLE?
 ¶ 28. Hubbard asserts that plain error occurred at trial when the prosecutor told the jury that Hubbard would be eligible for parole if convicted. Both parties agree that no objection was made at trial by Hubbard's counsel. If a contemporaneous objection was not made, Hubbard must rely on plain error to raise his argument on appeal. Williams v. State, 794 So.2d 181, 187
(¶ 23) (Miss. 2001). Only an error so fundamental that it creates a miscarriage of justice rises to the level of plain error.Hayes v. State, 801 So.2d 806, 811 (¶ 16) (Miss.Ct.App. 2001). Error is plain when it "affects the substantive rights of the defendant." Mitchell v. State, 788 So.2d 853, 855 (¶ 9) (Miss.Ct.App. 2001) (citing Porter v. State, 749 So.2d 250, 261
(¶ 36) (Miss.Ct.App. 1999)).
 ¶ 29. When this Court is determining if plain error has occurred we must consider if there is anything that "seriously affects the fairness, integrity or public reputation of judicial proceedings." Id. We must look to see if there was a violation of some legal rule that could be considered "plain," "clear," or "obvious" and was prejudicial on the result of the trial. Id.
Hubbard was indicted and found guilty of armed robbery in violation of Mississippi Code Annotated Section 97-3-79. Section 47-7-3(1)(d)(ii) states that no person convicted of this crime after October 1, 1994, shall be eligible for parole.
 ¶ 30. The statements by the State during opening and closing arguments were erroneous; however, we can find no plain error. The trial judge properly instructed the jury to (1) find Hubbard guilty and set the term of penalty at life imprisonment, or (2) find him guilty and not agree to fix the penalty, or (3) find him not guilty. Parole was never an issue for the jury's determination. Hubbard has failed to show that a substantial right was affected by the statements. This issue is without merit.
 ¶ 31. THE JUDGMENT OF THE CIRCUIT COURT OF CALHOUN COUNTY OFCONVICTION OF ROBBERY WITH A DEADLY WEAPON AND SENTENCE OFTHIRTY-FOUR *Page 22 YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OFCORRECTIONS IS AFFIRMED. ALL COSTS OF APPEAL ARE ASSESSED TO THEAPPELLANT.
KING, C.J., BRIDGES AND SOUTHWICK, P.JJ., THOMAS, LEE, CHANDLER AND GRIFFIS, JJ., CONCUR. IRVING, J., CONCURS IN RESULT ONLY.