MYERS, J.,
for the Court.
¶ 1. On October 29, 2002, Zachary Johnson was convicted of murdering Verendia Hill and of committing aggravated assault upon Andy Jemison. Johnson was later sentenced to serve life for the conviction of murder and fifteen years for the conviction of aggravated assault, sentences to run consecutively.
¶ 2. Aggrieved by his convictions, Johnson now appeals, raising the following four issues:
I. WHETHER JOHNSON’S TRIAL COUNSEL WAS INEFFECTIVE?
II. WHETHER THE CIRCUIT COURT ERRED IN REFUSING TO QUASH COUNT II OF THE INDICTMENT?
III. WHETHER THE CIRCUIT COURT ERRED IN ALLOWING THE STATE TO AMEND THE INDICTMENT AFTER IT HAD PRESENTED ALL OF ITS EVIDENCE?
IV.WHETHER THE CIRCUIT COURT COMMITTED REVERSIBLE ERROR IN ALLOWING A VIOLATION OF THE WITNESS SEQUESTRATION RULE?
¶ 3. Finding no reversible error, we affirm the judgment of the circuit court.
FACTS
¶ 4. Johnson had been in a relationship with Hill for roughly seven years. Hill had four daughters by men other than Johnson. Johnson and Hill broke up, and very soon after the breakup Hill began seeing Andy Jemison. Johnson was not pleased by Hill’s relationship with Jemi-son; so, on the night in question Johnson went over to Hill’s house and confronted her about her new relationship. She told Johnson that she had moved on and that she did not want to see Johnson anymore. Unable to persuade Hill through the use of words, Johnson left. A short time later that night, around midnight, Johnson returned to Hill’s house. This time, however, he was armed not with words, but with a shotgun. He forced his way past Hill, who had come to answer the door, and entered the house, where he found Jemi-son. He chased Jemison upstairs and, finally cornering him, shot him several times with the shotgun. Hill ran outside into the street, and one of her daughters, who had been awakened by the gun shots, ran outside with her. Leaving Jemison seriously injured, Johnson proceeded back down the stairs and followed Hill outside. The daughter who had fled outside with Hill attempted to stop Johnson from shooting Hill, but he pushed her aside and aimed his weapon at Hill, who was now kneeling on the ground before him. She pleaded with Johnson to spare her life, but he refused to relent. At point blank range, Johnson opened fire. At least two neighbors in addition to Hill’s daughter, *1177 Kenya, who had fled the house with Hill, witnessed the shooting. A few moments later, Hill died.
¶ 5. The police arrived literally seconds after the shooting, and they saw Hill take her last few breaths. Kenya pointed out Johnson, who was still standing nearby, as the man who shot her mother, and, because of this, the police moved to apprehend Johnson. He did not struggle or resist as the police took him into custody; in fact, after being identified by Kenya, he indicated to the police that he was indeed the shooter of Hill and showed them where he had dropped the shotgun (the murder weapon) in the grass a short distance away. Several other officers returned to investigate the scene of Hill’s house where they found the seriously injured Jemison. Jemison was rushed to the hospital and given treatment.
¶ 6. While in custody, Johnson waived his Miranda rights and gave a statement to the police. In essence, he said that he was extremely angry and under the influence of several intoxicants (cocaine, marijuana, and alcohol) and that the whole incident all just kind of “happened” before he truly realized what was going on. He was examined several months later by mental health professionals and they agreed that, while he may have been under some emotional disturbance over the breakup, he understood the wrongness and criminality of what he did. There was one doctor who opined that Johnson was under extreme emotional disturbance, such that his capacity to fully appreciate the criminality of his conduct was substantially impaired, but this single opinion was disagreed with by the other mental health professionals in the case.
¶ 7. In any event, there is no question that Johnson shot and killed Hill and that he shot and seriously injured Jemison.
LEGAL ANALYSIS
I. WHETHER JOHNSON’S TRIAL COUNSEL WAS INEFFECTIVE?
¶ 8. Johnson argues that his counsel was ineffective (1) for failing to file appropriate pre-trial motions, (2) for failing to cross-examine many of the State’s witnesses, (3) for filing a motion for psychiatric examination, and (4) for waiving Johnson’s rights to a speedy trial without his express consent.
¶ 9. The State argues that Johnson’s counsel was adequate and that, in any event, he was not prejudiced by any alleged errors in his counsel’s performance.
STANDARD OF REVIEW
¶ 10. When claims of ineffective assistance of counsel are raised for the first time on direct appeal we follow the procedure outlined in Read v. State, 430 So.2d 832, 841-42 (Miss.1983). This procedure requires us to do the following:
[Cjonduct a thorough review of the record to see whether a determination can be made from the record that counsel’s performance was constitutionally substandard. “Assuming that the Court is unable to conclude from the record that defendant’s trial counsel was constitutionally ineffective,” the court is directed to consider any other issues raised in the appeal and, assuming no reversible error is found among them, to affirm “without prejudice to the defendant’s right to raise the ineffective assistance of counsel issue via appropriate post-conviction relief proceedings.”
Wash v. State, 807 So.2d 452, 461(¶34) (Miss.Ct.App.2001) (quoting Read, 430 So.2d at 841). We have also held in this regard:
We should reach the merits on an ineffective assistance of counsel issue on direct appeal only if “(1) the record affir *1178 matively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge.” Colenburg v. State, 735 So.2d 1099, 1101 (Miss.Ct.App.1999). If the issue is not examined because of the state of the record, and assuming the conviction is affirmed, the defendant may raise the ineffective assistance of counsel issue in post-conviction relief proceedings. Read, 430 So.2d at 841.
Pittman v. State, 836 So.2d 779, 787(¶ 39) (Miss.Ct.App.2002).
DISCUSSION
¶ 11. While we are, admittedly, very skeptical about the merits of Johnson’s arguments on ineffective assistance, especially given the fact that Johnson committed these extremely brutal acts in the plain view of so many witnesses (which would make any possible change in the outcome of the trial exceedingly improbable at best), we are constrained in this case to follow the general rule on direct appeals raising claims of ineffective assistance of counsel. Pittman, 836 So.2d at 788(¶ 43). We do not find the record of this case to affirmatively show ineffectiveness of constitutional dimensions, nor do we find any stipulation by the parties regarding the adequacy of the record. Id. at 787(¶ 39). Because of this, we will observe the normally applicable procedure of denying relief without prejudice, so that Johnson may, should he so choose, pursue the issue further in a motion for post-conviction relief.
II. WHETHER THE TRIAL COURT ERRED IN REFUSING TO QUASH COUNT II OF THE INDICTMENT?
¶ 12. Johnson argues that count II of the indictment was fatally flawed in that it improperly blended language from subsections (a) and (b) of Mississippi Code Annotated § 97-3-7(2) (Rev.2000). Because of this alleged blending of the subsections, Johnson argues that the trial court committed plain error in not quashing count II of the indictment.
¶ 13. The State argues that while a few words from subsection (a) were inadvertently included in the indictment, there was no real question as to which subsection Johnson was being charged under. This is because, the State argues, the indictment charged that Johnson used a deadly weapon to cause bodily injury to Jemison; therefore, the only subsection which could possibly be applicable is subsection (b).
STANDARD OF REVIEW
¶ 14. Assignments of error challenging an indictment as fatally flawed raise an issue of law; therefore, our standard of review would normally be de novo. Williams v. State, 772 So.2d 406, 408(¶ 8) (Miss.Ct.App.2000). However, since no contemporaneous objection on this issue was raised at trial, Johnson must argue for a finding of plain error. Hubbard v. State, 886 So.2d 12, 21(¶28) (Miss.Ct.App.2004).
¶ 15. In reviewing the record for plain error “we must consider if there is anything that ‘seriously affects the fairness, integrity or public reputation of judicial proceedings.’ We must look to see if there was a violation of some legal rule that could be considered ‘plain,’ ‘clear,’ or ‘obvious’ and was prejudicial on the result of the trial.” Id. (citations omitted) (quoting Mitchell v. State, 788 So.2d 853, 855(¶ 9) (Miss.Ct.App.2001)). We have also held in this regard that “only an error so fundamental that it creates a miscar *1179 riage of justice rises to the level of plain error.” Hubbard, 886 So.2d at 21(¶28).
DISCUSSION
¶ 16. Upon reviewing the indictment, we find that it does indeed use phraseology from both subsections, but we do not find that this blending should be classified necessarily as a “defect.” Yet even if we were to accept that this blending of the subsections was a defect, such a defect in this case would be one of form only, and, ultimately, Johnson would be guilty under either subsection (a) or (b) of Mississippi Code Annotated § 97-3-7(2). This is so because Johnson recklessly and knowingly caused serious bodily injury to Jemison; he did so by means of a deadly weapon; and Johnson’s actions most definitely manifested an extreme indifference to human life. Indeed, under the facts of this case, Johnson’s actions could easily meet all of the elements of both subsections.
¶ 17. Thus, there was no plain error in the trial court’s failure to quash count II of the indictment. Not only was there nothing “clearly” or “obviously” wrong with the trial court’s action respecting the indictment, but also there was nothing that would have prejudiced Johnson, even had the trial court committed some kind of obvious error in this regard. This is because, as we have already noted, Johnson was clearly and obviously guilty of this crime, and he would have been guilty under either subsection.
¶ 18. We have seen a fair number of cases recently advancing this same, tenuous argument regarding an alleged improper blending of subsections (a) and (b) of Mississippi Code Annotated § 97-3-7(2). This seems a somewhat puzzling phenomenon, because Mississippi Code Annotated § 97-3-7(2) is far from complicated or difficult to understand. Very simply, Mississippi Code Annotated § 97-3-7(2) establishes two separate, but largely overlapping, ways for committing aggravated assault: one involves causing serious bodily injury through recklessness that manifests extreme indifference to human life (that is subsection (a), the subsection that uses the phrase “recklessly ... manifesting extreme indifference to human life”— note the absence of the phrase “deadly weapon” in subsection (a)), the other involves the use of a deadly weapon (that is subsection (b), the subsection that uses the phrase “deadly weapon”). Miss.Code Ann. § 97-3-7(2)(a)-(b). Frankly, we do not see what should be confusing in these sections in general, and in particular, we do not see what could have been questionable or confusing about the indictment here, given the facts of this case.
¶ 19. We did not go into many particular details in our recitation of the facts above, because they are so gruesome. Yet, in light of Johnson’s argument under this issue (which speaks of what we should find to be “plain,” “clear,” and/or “obvious” respecting the indictment), we feel compelled to state some of those particular details briefly now. The shotgun blast that Johnson produced literally blew Jemi-son’s knee off; thus, after the shooting, where Jemison’s left knee should have been, there was, literally, a gaping hole. After inflicting this extreme injury upon Jemison, Johnson fired again, this time-again literally-blowing chunks of flesh out of Jemison’s side and in general peppering Jemison’s body with buck shot. The reason why Jemison was subjected to such a brutal assault upon his person was because he had become Hill’s boyfriend.
¶20. We find that Johnson’s actions plainly, clearly, and obviously would qualify as aggravated assault under either subsection (a) or (b) of Mississippi Code Annotated § 97-3-7(2), because he (1) used a *1180 deadly weapon and (2) caused serious bodily injury through recklessness, manifesting an extreme indifference to human life. Yet, even if there was some doubt about the particular subsection of Mississippi Code Annotated § 97-3-7(2) that was intended to be covered by the indictment, we note that our supreme court has held that Mississippi Code Annotated § 97-3-7(2) may be read to cover a “considerable latitude” of varying factual situations. Stevens v. State, 808 So.2d 908, 920(¶ 35) (Miss.2002). The Stevens court also held that one may be simultaneously charged under both subsections of Mississippi Code Annotated § 97-3-7(2); thus, the two subsections are not mutually exclusive. Stevens, 808 So.2d at 920(¶ 36). The Stevens case supports the finding we alluded to above, namely that the blending of the subsections of this particular statute is not necessarily a defect and in this case does not warrant reversal. See also Stegall v. State, 765 So.2d 606, 614(¶23) (Miss.Ct.App.2000) (Irving, J., concurring)
¶ 21. Therefore, we find this issue to be plainly without merit.
III. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE STATE TO AMEND THE INDICTMENT AFTER IT HAD PRESENTED ALL OF ITS EVIDENCE?
¶ 22. Johnson argues that the State’s amendment to the indictment was substantive and, therefore, should not have been allowed. Johnson also argues that the State should not have been allowed to amend the indictment after it had presented its case-in-chief and was on the point of resting. The State argues that the defect was purely formal and that the amendment was proper.
STANDARD OF REVIEW
¶ 23. This issue raises questions of law relating to the indictment that we review de novo. Montgomery v. State, 891 So.2d 179, 185(¶ 22) (Miss.Ct.App.2004); Williams, 772 So.2d at 408(¶ 8).
DISCUSSION
¶ 24. On the particular subject of amendments to an indictment we have held:
An indictment may only be amended at trial if the amendment is not material to the merits of the case and the defense will not be prejudiced by such amendment. Griffin v. State, 584 So.2d 1274, 1276 (Miss.1991); see Mitchell, 739 So.2d at 404. The test for whether an amendment to the indictment will prejudice the defense is whether the defense as it originally stood would be equally available after the amendment is made. Griffin, 584 So.2d at 1276. Furthermore, it is well settled that an indictment may be amended after the State has rested. See Burt v. State, 493 So.2d 1325, 1328 (Miss.1986). See generally Burks v. State, 770 So.2d 960, 962-63 (Miss.2000).
Montgomery, 891 So.2d at 186(¶ 23).
¶ 25. As this quote from the Montgomery case makes clear, Johnson’s arguments under this issue are meritless. The first thing to note is that “it is well settled that an indictment may be amended after the State has rested.” Id. Thus, Johnson’s argument about the timing of the amendment is meritless, because the State can make a formal amendment to the indictment after it has rested. Id.
¶ 26. Regarding Johnson’s other argument about the amendment to the indictment being substantive, we note that the indictment did, in fact, incorrectly state that Johnson shot Jemison in, among *1181 other places, the left elbow and left forearm. Jemison was actually shot in the right elbow and right forearm. However, we find the State’s argument to be correct on this point. The State argues that the defect was purely formal because, whether it was the right or left elbow and forearm, the crime was still aggravated assault and Johnson was still obviously guilty. In other words, wherever Johnson shot Jemison, he did so in violation of the aggravated assault statute under which he was indicted.
¶ 27. As the Montgomery case declares, “The test for whether an amendment to the indictment will prejudice the defense is whether the defense as it originally stood would be equally available after the amendment is made.” Id. From our review of the record, we find that Johnson’s defense throughout was that he was acting in the heat of passion, such that he must have committed some other, lesser offense than the one charged in the indictment. Johnson never attempted to deny or contest that he did, in fact, shoot and seriously injure Jemison (and, for that matter, shoot and kill Hill). Thus, whether Jemison was shot in the right or left elbow and forearm had no real bearing upon Johnson’s defense posture.
¶ 28. Moreover, we cannot say that Johnson’s defense was prejudiced by this amendment, even in spite of Johnson’s contention that part of his defense was that he did not, in fact, shoot Jemison in the left elbow or left forearm. We find this argument to be, frankly, less than specious. We believe, and that not without good reason, that the defense of “I did not, in fact, shoot the defendant in the left elbow and forearm; rather, I shot him in the right elbow and forearm” could not possibly have lent Johnson any aid at trial. Most certainly, such a defense would not have had any bearing on the outcome of the case, because, either way, Johnson shot Jemison at point blank range with a shotgun. That would be aggravated assault regardless of the particular side and other parts of Jemison’s body that were actually struck by the shots.
¶ 29. We find the defect in the indictment to have been formal only, and we further find that no prejudice inured to the detriment of Johnson’s defense as a result of the amendment of the indictment. Therefore, we find this issue to be merit-less.
IV. WHETHER THE CIRCUIT COURT COMMITTED REVERSIBLE ERROR IN ALLOWING A VIOLATION OF THE WITNESS SEQUESTRATION RULE?
¶ 30. Johnson argues that the trial court committed reversible error in allowing Detective Morris to be recalled to the stand after being seated in the courtroom during other witnesses’ testimony. In effect, Johnson argues that this was a violation of the witness sequestration rule (Rule 615 of the Mississippi Rules of Evidence) that should warrant a new trial. The State argues that the witness was not testifying to any contested matter upon which there might have been danger of falsification or collusion and that, therefore, allowing Detective Morris to testify was not an abuse of discretion.
STANDARD OF REVIEW
¶ 31. We review challenges to a violation of the witness sequestration rule for abuse of discretion. Douglas v. State, 525 So.2d 1312, 1317-18 (Miss.1988).
DISCUSSION
¶ 32. Detective Morris, upon being called to the stand for the first time, testified that he was called to the scene, that he read Johnson his Miranda rights, and *1182 that he performed gunshot residue tests on Johnson at the Laurel Police Department. The State, in questioning other witnesses on how the shotgun and other physical evidence arrived at the Laurel Police Department from the Mississippi Crime Lab, found that Detective Morris needed to be recalled to the stand. Upon being recalled, Detective Morris testified that he personally transported the shotgun, the gunshot residue tests, and other items from the Mississippi Crime Lab to Detective Earl Reed at the Laurel Police Department. Johnson objected to Detective Morris being recalled to the stand, because Detective Morris had been sitting in the courtroom after concluding his initial testimony and had, therefore, heard some of the testimony of other witnesses.
¶ 33. We do not find any abuse of discretion in the trial court’s decision allowing Detective Morris to be recalled to the stand after hearing the testimony of other witnesses. The official comment to M.R.E. 615 declares, “The excluding or sequestering [of] witnesses has long been recognized as a means of discouraging and exposing falsification, inaccuracy, and collusion.” With that principle in mind, we note in the case sub judice that there was no real issue regarding the authenticity of the proffered shotgun or the integrity of the chain of custody of the shotgun. Here again, Johnson never contended that the gun produced was not, in fact, the gun he used or that he did not, in fact, commit the acts for which he was charged or that the gun had been tampered with in some way. Rather, his defense posture was that he used the proffered shotgun in the heat of passion, and the issue regarding the admissibility of the shotgun touched upon a purely technical matter that had nothing to do with Johnson’s guilt or innocence. Thus, Detective Morris’s testimony went to an uncontested and purely technical matter of the procedure for introducing the shotgun into evidence and establishing its chain of custody. Because of this, none of the reasons behind the witness sequestration rule were implicated, and we find that the trial court did not abuse its discretion in allowing Detective Morris to be recalled to the stand.
¶ 34. Therefore, this issue is without merit.
¶ 35. THE JUDGMENT OF THE CIRCUIT COURT OF JONES COUNTY OF CONVICTION OF COUNT I MURDER AND SENTENCE OF LIFE; CONVICTION OF COUNT II AGGRAVATED ASSAULT AND SENTENCE OF FIFTEEN YEARS TO RUN CONSECUTIVELY TO THE SENTENCE IN COUNT I, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO JONES COUNTY.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR.